Lonnie SHEPPARD, Plaintiff,

v.

TCW/DW TERM TRUST 2000, TCW/DW Term Trust 2003, Dean Witter Distributors, Inc., Dean Witter Intercapital Inc., Dean Witter Reynolds, Inc., TCW Funds Management, Inc., Robert A. Day, John C. Argue, Richard M. DeMartini, Charles A. Fiumefreddo, John R. Haire, Dr. Manuel H. Johnson, Paul Kolton, Thomas E. Larkin, Jr., Michael E. Nugent and David S. Tappan, Jr., Defendants.

Edmund MERMELSTEIN, Plaintiff,

v.

TCW/DW TERM TRUST 2000, TCW/DW Term Trust 2003, Dean Witter Distributors, Inc., Dean Witter Intercapital Inc., Dean Witter Reynolds, Inc., TCW Funds Management, Inc., Robert A. Day, John C. Argue, Richard M. DeMartini, Charles A. Fiumefreddo, John R. Haire, Dr. Manuel H. Johnson, Paul Kolton, Thomas E. Larkin, Jr., Michael E. Nugent and David S. Tappan, Jr., Defendants.

Nos. 94 Civ. 8865 (AGS),
94 Civ. 5404 (AGS).

United States District Court,
S.D. New York.

Aug. 16, 1996.

Abbey & Ellis, New York City, for Plaintiffs.

Gordon, Altman, Butowsky Weitzen, Shalov & Wein, O'Melveny & Myers, Paul Weiss

Rifkind, Wharton & Garrison, New York City, for Defendants.

## OPINION & ORDER

SCHWARTZ, District Judge:

This is a class action brought by plaintiffs on behalf of all persons, other than defendants and related parties, who purchased shares in TCW/DW Term Trust 2003 ("Trust 2003") during the period from its inception on or about April 22, 1993 to July 19, 1994 and/or shares in TCW/DW Term Trust 2000 ("Trust 2000") during the period from its inception on or about December 22, 1993 to July 19, 1994 (the "Class Period"). On behalf of the purported class, plaintiffs assert violations of Sections 11, 12(2) and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k, 77l(2) and 77o, Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78j(b), and rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, and Section 13 of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a–13.

This matter is before the Court upon defendants' motion to dismiss the Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), and for failure to plead fraud with particularity, pursuant to Rule 9(b). For the reasons stated below, defendants' motion is granted.

## BACKGROUND

The following facts and contentions appear in the Complaint and the documents upon which it is largely based—specifically, the prospectuses for Trust 2000 and Trust 2003.[1]

Trust 2000 and Trust 2003 are closed-end diversified management investment companies, commonly known as Massachusetts business trusts, and were organized under the laws of the Commonwealth of Massachusetts (collectively, the "Trusts"). Other defendants in this action include the Trusts' investment adviser, TCW Funds Management Inc.; the manager of the Trusts, Dean Witter InterCapital Inc.; the underwriter of the offerings, Dean Witter Distributors, Inc.; the underwriter and manager's parent, Dean Witter Reynolds, Inc.; and various individuals who acted, *inter alia*, as trustees of the Trusts. Plaintiffs purchased a number of shares in the Trusts, the value of which declined as interest rates rose in 1994.

Plaintiffs' allegations of wrong-doing fall into three categories: (1) the issuance of false statements in reports filed with the Securities Exchange Commission ("SEC"), including the prospectus in the Registration Statements used to market the offerings, (2) the use of deceptive marketing practices, and (3) deviation from the fundamental policies of the Trusts without a shareholder vote. Plaintiffs claim that, had the defendants accurately disclosed the investment policies of the Trusts and accurately described the investments and the composition of the portfolios of the Trusts and the risks associated therewith, they would not have invested in the Trusts or would not have paid the prices they paid. In addition, plaintiffs assert that, had the defendants adhered to the fundamental policies of the Trusts, plaintiffs would not have suffered the loss of over 20% of their investments.

The investment objectives of the Trusts, as stated in the prospectus, were to provide a high level of current income and return $10 per share, the initial public offering price, to shareholders on the termination date. According to statements in the prospectus, these objectives were to be achieved by investing in high quality fixed-income securities, such as mortgage-backed securities, asset-backed securities, zero coupon securities of municipal issuers, other municipal securities and debt securities of non-U.S. issuers, which had a final or expected maturity on or about the termination date of the respective trust. The prospectus stated that, under current market conditions, the Trusts expected that approximately 85% of their total assets would be invested in mortgage-backed securities, such as those issued by the Government National Mortgage Association, the Federal National Mortgage Association, and the Federal Home Loan Mortgage Corporation, private mortgage pass-through securities, collateralized mortgage obligations, in-

---

1. The Court shall hereinafter refer to the prospectuses for Trust 2000 and Trust 2003 in the singular, given that the disclosure in the two prospectuses is virtually identical.

cluding inverse floaters, stripped mortgage-backed securities and asset-backed securities; while approximately 15% of their assets would be invested in zero coupon securities of municipal issuers and other municipal securities. It was further disclosed that the Trusts could invest up to 25–30% (25–40% for Trust 2000) of their assets in inverse floaters. Investors were also informed that the Trusts could borrow or utilize leverage in an amount not to exceed 33.3% of total assets, including the amount borrowed.

Plaintiffs allege that the Trusts were marketed to investors by emphasizing the credit quality of the securities while obscuring the Trusts' reliance on mortgage-backed derivatives and the magnitude of the interest rate risk of the portfolio, which interest rate risk overwhelmed the safety presented by the credit quality of the portfolio. According to plaintiffs, the prospectus failed to disclose that the initial structures of the Trusts' portfolios were biased toward a declining interest rate scenario and that such bias ensured that the Trusts would suffer severe losses in the event of a rise in interest rates. In addition, plaintiffs claim that, although the Trusts' intent to invest in inverse floaters was disclosed, such disclosure was misleading and the potential volatility of inverse floaters was cloaked in "meaningless corporate terms." Compl. ¶ 31. Plaintiffs further allege that the dollar weighted average maturity of the Trusts' portfolios were 21 and 18 years, respectively, and that this represented a departure from the Trusts' fundamental policies, without the Trusts' having conducted the requisite shareholder vote.

Defendants move to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that (1) plaintiffs have failed to allege any material misrepresentations or omissions, (2) plaintiffs have failed to plead facts suggesting scienter, in violation of Federal Rule of Civil Procedure 9(b), and (3) the Trusts have not violated any fundamental policy.

*DISCUSSION*

In ruling on a motion to dismiss the Complaint for failure to state a claim, plaintiffs' factual allegations must be taken as true, and the Court may only grant the motion where no set of facts could support plaintiffs' claim. *International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The Court may take into consideration documents upon which the Complaint relies and which are integral to the Complaint, such as the trust prospectuses, without converting the motion to one for summary judgment. *See id.* at 72.

I. *Plaintiffs' 1933 Act and 1934 Act Claims*

■ Sections 11 and 12(2) of the 1933 Act, 15 U.S.C. 77k & 77l(2), and Section 10(b) of the 1934 Act and Rule 10(b)(5) thereunder, 15 U.S.C. § 78j, 17 C.F.R. § 240.10b–5, all require plaintiffs to identify a false statement of material fact or the omission of a material fact. *See I. Meyer Pincus & Assocs. P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 761 (2d Cir.1991). Section 11 of the 1933 Act holds, *inter alia,* a signer, officer of an issuer, or underwriter liable for a registration statement "contain[ing] an untrue statement of a material fact or omitt[ing] to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(2) of the 1933 Act prohibits any person from offering or selling a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(2).[2] To state a claim under Section 10(b) of the 1934 Act, plaintiffs must allege that defendants made a false statement or omitted a material fact, with scienter, and that plaintiffs' reliance on defendants' action caused plaintiffs injury. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808 (2d Cir.1996).

---

2. Section 15 of the 1933 Act holds controlling persons liable for Section 11 and 12(2) violations "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

Because the Court finds that the Trusts truthfully represented and adequately disclosed their investment strategies and the inherent risks therein, plaintiffs' claims under these statutes must be dismissed. *See In re Hyperion Secs. Litig.*, 93 Civ. 7179 (MBM), 1995 WL 422480 *5 (S.D.N.Y. July 14, 1995).

■ Plaintiffs allege that the prospectus "obscur[ed] the Trust's reliance on mortgage backed derivatives and the magnitude of the interest rate risk of the portfolio...." Compl. ¶ 20. However, the prospectus twice stated that approximately 85% of trust assets would be invested in mortgage-backed securities and specifically warned potential investors of the risk related to an increase in interest rates. For example, the prospectus warned:

> mortgage-backed and asset-backed securities may decrease in value as a result of increases in interest rates and may benefit less than corporate debt securities from decreases in interest rates.

> Because the Trust is concentrated in mortgage-backed and asset-backed securities, it is more susceptible to factors affecting such securities than is an investment company that is not concentrated in these securities.

Notice of Motion, Ex. A (Trust 2003 prospectus) at 8; *see also id.* at 20 ("Mortgage-backed securities generally decrease in value as a result of increases in interest rates and may benefit less than other fixed income securities from declining interest rates because of the risk of prepayment"). The prospectus further stated:

> The value of the Trust's portfolio securities, and therefore the Trust's net asset value per share, will increase or decrease due to various factors, principally changes in prevailing interest rates and the ability of the issuers of the Trust's portfolio securities to pay interest and principal on such obligations. Net asset value generally increases when interest rates decline, and decreases when interest rates rise, although this is not always the case.

*Id.* at 10. Thus, the prospectus fully disclosed that the Trusts were particularly susceptible to an increase in interest rates, due to the concentration of their assets in mortgage-backed and asset-backed securities, and that if interest rates were to rise, the net asset value of the Trusts would most likely decline.

Plaintiffs claim that such disclosures were mere boiler-plate and that the prospectus should have characterized the types of mortgage-backed securities in which the Trusts invested as "exotic mortgage derivatives." In the alternative, plaintiffs argue that the disclosures were buried or not given adequate prominence.

The Court disagrees. Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested. *See In re Donald J. Trump Casino Secs. Litig.*, 7 F.3d 357, 375 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) ("plaintiffs cannot successfully contend that the prospectus is actionable because it failed to describe its debt-equity ratio as either 'unwarranted' or 'excessive'"); *Goldberg v. Meridor,* 567 F.2d 209, 218, n. 8 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978) ("We do not mean to suggest that § 10(b) or Rule 10b–5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives"). Nor does the Court find that the prospectus' disclosure of the risks related to such securities constituted "a vague or blanket (boilerplate) disclaimer." *Kline v. First Western Gov't Secs., Inc.,* 24 F.3d 480, 489 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994). The prospectus described in detail each type of mortgage-backed security in which the Trusts might invest, including collateralized mortgage obligations ("CMO's"), inverse floaters—a class of CMO's, and stripped mortgage-backed securities. In addition to describing particular risks related to certain types of mortgage-backed securities, the prospectus included a section entitled "Risk Factors Relating to Mortgage–Backed Securities". The risks recited in this section relate, *inter alia,* to the rate of prepayment on the underlying mortgage loans, changes in interest rates, and changes in the amounts available for reinvestment by the Trust and are described in a

detailed, intelligible manner. For example, the pre-payment risk was described as follows:

> Among the major differences [between mortgage-backed securities and traditional debt securities] are that interest and principal payments are made more frequently, usually monthly, and that principal may be prepaid at any time because the underlying mortgage loans or other assets generally may be prepaid at any time. As a result, if the Trust purchases such a security at a premium, a prepayment rate that is faster than expected will reduce yield to maturity, while a prepayment rate that is slower than expected will have the opposite effect of increasing yield to maturity. Alternatively, if the Trust purchases these securities at a discount, faster than expected prepayments will increase, while slower than expected prepayments will reduce, yield to maturity.
>
> ... [A]s a general rule prepayments on fixed rate mortgage loans will increase during a period of falling interest rates and decrease during a period of rising interest rates. Accordingly, amounts available for reinvestment by the Trust are likely to be greater during a period of declining interest rates and, as a result, likely to be reinvested at lower interest rates than during a period of rising interest rates. Mortgage-backed securities generally decrease in value as a result of increases in interest rates and may benefit less than other fixed income securities from declining interest rates because of the risk of prepayment.

Notice of Motion, Ex. A at 19–20.

In addition to such disclosures relating to mortgage-backed securities, the prospectus described specific risks associated with asset-backed securities, *id.* at 20 ("credit card receivables generally are unsecured and the debtors are entitled to the protection of a number of state and federal consumer credit laws, including the bankruptcy laws, some of which may reduce the ability to obtain full payment"), zero coupon securities, *id.* at 21 ("the market prices of zero coupon securities are more volatile than the market prices of securities of comparable quality and similar maturity that pay interest periodically and may respond to a greater degree to fluctuations in interest rates than do such non-zero coupon securities. Many of the types of zero coupon securities in which the Trust may invest are currently categorized as illiquid under guidelines of the staff of the Securities Exchange Commission") and non-U.S. securities, *id.* at 23 ("risks include fluctuations in foreign exchange rates ..., future political and economic developments, and the possible imposition of exchange controls or other foreign governmental laws or restrictions" ...).

In short, the Court finds that the prospectus sufficiently disclosed the risks related to the types of securities in which the Trusts would invest, including the interest rate risk. Such disclosures were not buried or given inadequate prominence in the prospectus; rather, they constituted an integral part of the information presented to potential investors. Moreover, given the prospectus' repeated statements that approximately 85% of the Trusts' assets would be invested in mortgage-backed securities and that "mortgage-backed and asset-backed securities may decrease in value as a result of increases in interest rates," *id.* at 8, 20, the Trusts' alleged "bias" toward a declining interest rate scenario was clear to any potential investor who read the prospectus. The fact that, instead of declining, interest rates rose does not make the prospectus actionable under the securities laws.

Plaintiffs also assert that the Trusts' intent to invest in inverse floaters was disclosed "in a misleading manner so as to leave the impression that inverse floaters were a means to enhance income, hedge the Trusts' portfolios and preserve capital rather than as an integral part of the portfolio." Compl. ¶ 30. To the contrary, the prospectus summary stated up front that "[t]he Trust may also invest in inverse floaters in an amount up to 25–30% [25–40% for Trust 2000] of its total assets." Notice of Motion, Ex. A at 5, Ex. B at 5. There is no support for plaintiffs' contention that the prospectus failed to disclose that inverse floaters would constitute an integral part of the portfolios.[3] Moreover,

---

**3.** Plaintiffs concede that during the Class Period, Trust 2003 had 21% of its total assets invested in

the risks associated with investing in inverse floaters were repeatedly disclosed in the prospectus. *See id.* at 5 ("[i]nverse floaters exhibit greater price volatility than the majority of mortgage pass-through securities or CMOs"), 18 ("Inverse floaters have coupon rates that typically change at a multiple of the changes of the relevant index rate.... the value of inverse floaters will decrease as interest rates increase.... In addition, some inverse floaters exhibit extreme sensitivity to changes in prepayments").

Plaintiffs further allege that defendants made material misrepresentations concerning the dollar weighted average maturities of the portfolios. Plaintiffs point to the following passage in the prospectus:

> The Trust will seek to return $10 per Share to shareholders on or about December 31, 2003 [December 31, 2000 for Trust 2000] by preserving capital through the active management of its portfolio of securities, by investing in high quality fixed income securities which have a final or expected maturity on or about the termination date of the Trust.... Under current market conditions, the initial dollar weighted average maturity of the Trust's assets is expected to be approximately 8 to 12 years [5 to 10 years for Trust 2000].

Notice of Motion, Ex. A at 4, Ex. B at 4. Plaintiffs state that, during the Class Period, the dollar weighted average maturities of Trust 2003 and Trust 2000's assets was 21 years and 18 years, respectively. *See* Compl. ¶¶ 23–24. Plaintiffs assert that "[d]efendants failed to disclose that what was being referred to by average maturity was not the maturity date on the face of the instrument (a fixed ascertainable objectively measured date), but was instead a subjective estimation based on uncertain assumptions of prepayments of principle," compl. ¶ 25, and that "[d]efendants concealed from investors the specific prepayment assumptions under which they had calculated that the weighted average life of the securities in the portfolio coincided with the termination date of the Trust," which assumptions were "unreasonable in light of the rising interest rate sce-

narios prevailing in the United States in late 1993 and 1994." Compl. ¶ 26.

The Court first notes that the prospectus did not refer to the maturity date on the face of the instruments in which the Trusts would invest; rather, it referred to the "final *or expected* maturity". Nowhere did the prospectus represent that the Trusts would invest only in shorter-term securities or securities that would mature by the Trusts' dates of termination. Nor did the prospectus in any way suggest that the securities in the Trusts' portfolios would, in the aggregate, have a particular weighted average maturity over the entire term of each trust. Indeed, the phrasing of the sentence that followed: *[u]nder current market conditions,* the *initial* dollar weighted average maturity of the Trust's assets is *expected* to be *approximately* 8 to 12 years, signalled to investors that the term "weighted average maturity" referred to a calculation that shifted as interest rates and market conditions changed. Moreover, this passage must be read in context: the prospectus contained several discussions relating to the prepayment risk of mortgage-backed and asset-backed securities. The prospectus summary, under "Special Risk Considerations", stated "[p]repayment rates are influenced by changes in current interest rates and a variety of other economic, geographic, social and other factors. In general, changes in the rate of prepayments on a mortgage-backed or asset-backed security will change the yield to maturity of the security." Notice of Motion, Ex. A at 7. Thus, it was clear that the dates on which the securities in the Trusts' portfolios would mature depended on the rate at which the underlying mortgages were prepaid, which, in turn, depended on changes in interest rates and other factors.

■ Second, plaintiffs' allegation that defendants concealed from investors the specific prepayment assumptions under which they had calculated the weighted average life of the securities in the Trusts' portfolios does not state a claim. Such internal calculations and projections are not material facts that are required to be disclosed. *See In re Lyondell Petrochemical Co. Secs. Litig.,* 984

inverse floaters, a percentage that is within the     range set forth in the prospectus.

F.2d 1050, 1052–53 (9th Cir.1993); *In re Convergent Technologies Securities Litig.,* 948 F.2d 507, 516 (9th Cir.1991). Moreover, plaintiffs do not allege that defendants' internal calculations were "belied by [defendants'] actual knowledge of contradictory facts" at the time it was made. *Hershfang v. Citicorp,* 767 F.Supp. 1251, 1257 (S.D.N.Y. 1991). Plaintiffs allege no facts from which one could infer that defendants lacked a good faith basis for the calculations of the portfolios' initial weighted average maturity. Plaintiffs merely assert that defendants' assumptions were "unreasonable in light of the rising interest rate scenarios prevailing in the United States in late 1993 and 1994"—*after* shares in the Trusts were offered. Compl. ¶ 26. Failure to predict a rise in interest rates does not constitute fraud and cannot be the basis for alleging misrepresentations or omissions of material facts. *See Denny v. Barber,* 576 F.2d 465, 470 (2d Cir. 1978) ("while greater clairvoyance in 1973 might have led to a realization that foreign governments and enterprises might encounter difficulties ... failure to make such perceptions does not constitute fraud").

■ Plaintiffs attempt to introduce new allegations of misconduct in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaints. "Allegations made outside of the complaint are not properly before the court on a motion to dismiss." *In re Colonial Ltd. Partnership Litig.,* 854 F.Supp. 64, 79 (D.Conn.1994); *see also Morgan Distrib. Co., Inc. v. Unidynamic Corp.,* 868 F.2d 992, 995 (8th Cir.1989). However, even if the new allegations were properly before the Court, they would not survive defendants' motion.

■ First, plaintiffs claim that investors were misled by statements in the Trusts' Sales Brochures and prospectus to the effect that the "Trust may borrow or utilize leverage in an amount not exceeding 33⅓% of its total assets." Affidavit of Lee Squitieri ("Squitieri Aff."), Ex. 3 & 4. Plaintiffs allege that during the Class Period the Trusts borrowed nearly 1$ for every 2$ of investor funds, for a leverage ratio of nearly 50%. However, such a leverage ratio is not inconsistent with the plain language of the prospectus—the "single most important document and perhaps the primary resource an investor should consult." [4] *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1030 (2d Cir.1993). The prospectus twice states that "[t]he Trust may borrow or utilize leverage ... in an amount not exceeding 33⅓% of its total assets *(including the amount borrowed)."* Notice of Motion, Ex. A at 4, 29, Ex. B at 4, 29 (emphasis added). As defendants point out, "[b]ecause (as the quoted language specifies) the percentage of leverage is calculated by including the amount borrowed in the definition of 'total assets,' borrowing one dollar for every two dollars of investor funds *is* 33⅓% leverage, not 50%." Defendants' Reply Mem. of L. at 6.

■ Second, plaintiffs belatedly claim that defendants "fail[ed] to disclose the risk of the lack of liquidity of the Trusts' investments." Plaintiffs' Mem. of L. at 2. However, defendants point out that, as stated in the prospectus, the Trusts are closed-end investment companies, which "do not face the prospect of having to liquidate portfolio holdings in the event of net redemptions or having to maintain cash positions to meet potential redemptions." Notice of Motion, Ex. A at 12.[5] Moreover, the prospectus disclosed that

> [a]lthough the Adviser expects that substantially all of the Trust's investments will be in securities for which an established resale market exists, there is no overall limitation on the percentage of illiquid securities which may be held by the Trust. Liquidity of a security relates to the ability to easily dispose of the security and the price to be obtained and does not generally relate to the credit risk or likelihood of receipt of cash at maturity. Illi-

---

4. Potential investors in the Trusts were instructed to consult the prospectus "[f]or complete information." Squitieri Aff., Ex. 3 & 4.

5. Investors were also warned of the risk that trust shares could trade at a discount to net asset value: "[t]he Trust cannot predict whether its own Shares will trade at, below, or above net asset value. The Trust is designed primarily as a long-term investment and *not* as a trading vehicle." *Id.*

quid securities may trade at a discount from comparable, more liquid securities. Illiquid securities in which the Trust may invest include certain stripped securities, interest rate swaps, certain hedging instruments and restricted securities of corporate and other issuers.

*Id.* at 9. Thus, the prospectus disclosed that the Trusts were authorized to invest in illiquid securities and that investment in such securities carried with it certain risks. The Court finds that such disclosure was sufficient.

In sum, the prospectus clearly "bespeaks caution" in that the various risks inherent in purchasing shares in the Trusts were adequately disclosed. Indeed, the disclosures warned potential investors about the very contingency that came to pass—a rise in interest rates. *See I. Meyer Pincus*, 936 F.2d at 763; *In re: Hyperion Securities Litig.*, 1995 WL 422480 at *7. Accordingly, plaintiffs' claims under the 1933 Act and the 1934 Act fail to state a cause of action and must be dismissed pursuant to Rule 12(b)(6).

■ In addition, the Court finds that plaintiffs' Section 10(b) claim fails to satisfy the requirements of Federal Rule of Civil Procedure 9(b) as to pleading fraud with particularity and may be dismissed, in the alternative, pursuant to this Rule.[6] Rule 9(b) requires that:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. . . .

Fed.R.Civ.P. 9(b).

■ In order to satisfy the requirements of Rule 9(b) in pleading a cause of action under Section 10(b) and Rule 10b–5, plaintiffs must allege not only in what respects the statements at issue were false, but also "facts that give rise to a strong inference of fraudulent intent." *San Leandro*, 75 F.3d at 812. Plaintiffs may establish scienter by

either (1) identifying circumstances indicating conscious or reckless behavior by the defendants or (2) alleging facts that show a motive for committing fraud and a clear opportunity for doing so. *Id.* at 813. Plaintiffs need only plead "circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter." *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994). However, plaintiffs do not enjoy a license to base claims of fraud on speculation and conclusory allegations. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990).

■ Plaintiffs contend that they have alleged facts giving rise to an inference that defendants knew of or recklessly disregarded information that contradicted statements made in the prospectus. However, since the Court finds that the Complaint fails sufficiently to allege that statements in the prospectus were false or misleading (either affirmatively or through omissions), plaintiffs' allegations also fail to establish an inference of reckless or conscious misbehavior on the part of defendants in making such statements. The Complaint also lacks any allegation of facts demonstrating either motive or the opportunity to commit fraud, much less both. Accordingly, plaintiffs have failed to plead fraudulent intent, in violation of Rule 9(b), and their Section 10(b) and Rule 10b–5 claim must be dismissed on this ground as well.

## II. *Plaintiffs' 1940 Act Claims*

Section 8 of the 1940 Act directs an investment company to recite in its Registration Statement "all investment policies of the registrant . . . , which are changeable only if authorized by shareholder vote," as well as all policies that "the registrant deems matters of fundamental policy." 15 U.S.C. § 80a–8(b)(2) & (3). Section 13 prohibits a registered investment company from deviating from any such policies "unless authorized

---

6. Defendants argue that plaintiffs' claims under Section 11, 12(2) and 15 of the 1933 Act may also be dismissed pursuant to Rule 9(b). Rule 9(b) applies to claims made under these sections to the extent that such claims "sound[ ] in fraud, a conclusion which may be assumed if the alleged misstatements are those generally referred to earlier in the complaint." *Moran v. Kidder Peabody & Co.*, 609 F.Supp. 661, 666 (S.D.N.Y. 1985), *aff'd*, 788 F.2d 3 (2d Cir.1986). However, in this case, plaintiffs have specifically not incorporated by reference allegations of intentional and/or reckless misconduct in Counts II and III of the Complaint alleging violation of Sections 11, 12(2) and 15. *See* Compl. ¶¶ 50, 58.

by the vote of a majority of its outstanding voting securities." 15 U.S.C. § 80a–13.

■ Plaintiffs allege that defendants deviated from the Trusts' fundamental policies, without shareholder authorization, by investing in fixed income securities other than those "which have a final or expected maturity on or about the termination of the Trust". Plaintiffs refer the Court to the following paragraph in the prospectus:

> The investment objectives of the Trust are to provide a high level of current income and return $10 per Share (the initial public offering price) to shareholders on or about December 31, 2003 [December 31, 2000 for Trust 2000] (the termination date of the Trust). The Trust will seek to provide a high level of current income by investing in high quality fixed income securities which are either (i) issued or guaranteed by the U.S. Government or its agencies or instrumentalities or (ii) at the time of investment rated Aaa by Moody's or AAA by S & P or are determined by the Adviser to be of comparable quality to such rated securities. The Trust will seek to return $10 per Share to shareholders on or about December 31, 2003 [December 31, 2000 for Trust 2000] by preserving capital through the active management of its portfolio securities, by investing in high quality fixed income securities which have a final or expected maturity on or about the termination date of the Trust, and through retaining tax-exempt income from investments in zero coupon securities of municipal issuers and net income earned on any other municipal securities in which it may invest. The foregoing investment objectives are fundamental policies of the Trust and may not be changed without the approval of a majority of the outstanding voting securities of the Trust.

Notice of Motion, Ex. A at 13–14. The prospectus elsewhere refers to the Trusts' "investment objectives" as being (1) to provide a high level of current income and (2) return $10 per share to investors on or about the termination date. *See id.* at 3, 12.

The Court finds that, under the plain language of the prospectus, the fundamental policies of the Trusts are the two investment objectives noted above. The Trusts' intention to preserve capital by investing in fixed income securities which have a final or expected maturity on or about the time of termination is merely a strategy by which the Trusts will "seek to return $10 per Share to shareholders" at termination, not a fundamental policy. No other interpretation of the quoted text is reasonable. The first sentence of the passage states that the "*investment objectives* of the Trust are [1] to provide a high level of current income and [2] return $10 per Share (the initial public offering price) to shareholders" on or about the termination date of the Trust. Thus the "investment objectives" constitute these two goals. The language that follows explains the Trusts' strategies for reaching such goals. The last sentence of the paragraph states that "the foregoing investment objectives are fundamental policies" of the Trust. Only the two goals noted above are labelled "investment objectives" in this paragraph and elsewhere in the prospectus; therefore, only these objectives—and not the strategies for attaining them—are fundamental policies. Plaintiffs do *not* allege that defendants deviated from these two fundamental policies. Accordingly, plaintiffs' 1940 Act claim must be dismissed.[7]

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), is granted. The Clerk of the Court is directed to close this case.

SO ORDERED.

---

7.  Having found that plaintiffs fail to allege that the Trusts deviated from their fundamental policies, the Court need not address the disputed issue of whether Section 13(a)(3) of the 1940 Act provides a private right of action.