In re ASHANTI GOLDFIELDS
SECURITIES LITIGATION.

No. CIV.A. CV00–0717(DGT).

United States District Court,
E.D. New York.

Feb. 13, 2002.

Scott A. Edelman, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, Attorneys for the defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

A group of shareholders in Ashanti Goldfields Company Limited ("Ashanti") brought this action against Ashanti and two of its officers, Mark B. Keatley (CFO and member of the board of directors) and Sam Jonah (CEO and member of the board of directors), alleging that Ashanti and the officers of Ashanti made fraudulent statements between July 28, 1999 and October 5, 1999 in violation of § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 promulgated thereunder, and § 20(a) of the 1934 Act, concerning commodities futures activity by the company. Ashanti now moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), arguing that the complaint fails to include any actionable misstatements, that the statements that were made are protected by the safe harbor provision for "forward looking statements" under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and that the complaint fails to adequately allege scienter.

### Background

Ashanti is a corporation organized under the laws of the Republic of Ghana. Compl. ¶ 7. Traditionally, Ashanti's business has been the mining, processing, and sale of gold. Ashanti's 1998 Securities and Exchange Commission Form 20–F filing (the "1998 20–F") at 1.[1] In connection with this business, Ashanti also maintains a "hedge book," which is comprised of assorted financial instruments primarily dealing with

Paul D. Young, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Attorneys for the plaintiffs.

---

1. The 1998 20–F is Exhibit B of the Declaration of Douglas Henkin ("Henkin Decl.").

future sales of gold at set prices. *Id.* at 27.

According to the 1998 20–F, Ashanti's "hedging" operations generated $58.6 million of income in 1996, out of Ashanti's total profit of $81.4 million. *Id.* at F–9. In 1997, hedging produced $139.9 million of income, while overall Ashanti reported a $78.9 million profit. *Id.* In 1998, Ashanti generated a total of $600.3 million in revenue. *Id.* The hedge book generated $139.0 million of income that year, and Ashanti's total profit was $90.3 million. *Id.* Total revenue for 1999 revenue was $582.1 million, with $143 million of hedging income and $96.3 million in total profit. 1999 20–F at F–9.[2] According to an additional form filed by Ashanti with the SEC on July 28, 1999 (the "July 1999 6–K"), as of June 30, 1999, Ashanti had hedged 11 million ounces gold, which was just under 50 percent of its gold reserves. Compl. ¶ 19. At that point, the value of the hedge book was $290 million. Compl. ¶ 22.

The purported purpose of the hedge book was to protect Ashanti from fluctuations in the price of gold. Compl. ¶ 14. The shareholders allege that, contrary to this claimed purpose, the hedge book did not serve as a protective measure at all. Rather, the shareholders maintain that, undisclosed to investors, the hedging activity was actually a "reckless bet" that exposed Ashanti to tremendous risks in the event that the price of gold rose sharply. Compl. ¶ 16. The extent of these risks was exposed on September 26, 1999, when fifteen European central banks announced that they were limiting sales and leases of

gold (the "bank announcement"), causing the price of gold to rise by nearly $70 per ounce.[3] Compl. ¶ 26.

As a result of this rise in the price of gold, many of the contracts in Ashanti's hedge book became detrimental to the company. According to SEC filings and newspaper reports, the value of the hedge book dropped from $290 million to negative $570 million. Compl. ¶¶ 22, 29(e), 40. Primarily due to this sudden loss in value of the hedge book, Ashanti stock dropped from a high of $9.3785 per share to $5.50 per share. Compl. ¶ 33.[4] In addition, despite efforts to restructure the hedge book, the company was subjected to numerous margin calls from the counterparties to the contracts. Compl. ¶ 29(d). Although not explained in the complaint, these margin calls presumably protected the counterparties by ensuring that Ashanti would deliver the gold at the agreed-upon lower price. To meet these margin calls, Ashanti eventually was forced to sell a fifty percent interest in one of its largest mines and issue warrants for 15 percent of its stock. Compl. ¶ 43.

The shareholders allege that before and during these events, Ashanti's officers and directors made numerous misrepresentations regarding the hedge book, thereby concealing the extent of the risks the company faced.

These statements are each discussed in detail below, but on the whole they generally relate to the characterization that Ashanti gave to the hedge book, labeling and describing it as a precautionary measure

---

2. The 1999 20–F is Exhibit M of the Henkin Declaration.

3. The shareholders allege that the price of gold increased by more than $55 per ounce after the bank announcement. However, gold closed at $268.50 an ounce on Friday, September 24, 1999, the last day of trading before the bank announcement, and rose to a

high of $338 an ounce on October 5, 1999, an increase of more than 25 percent. Henkin Decl. Ex. J.

4. Ashanti common stock sold at $5.50 per share on October 5, 1999, the last day of the Class Period. Compl. ¶ 33. The next day, the price fell to $4.125 per share. Compl. ¶ 36.

to protect against shifts in the price of gold when, in fact, it was speculation. In addition, the shareholders allege that Ashanti withheld adverse information concerning the hedge book and the financial state of the company. The purpose and result of this misrepresentation and concealment, the shareholders contend, was to artificially inflate the value of Ashanti stock.

### Discussion

The shareholders allege that defendants violated § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, and § 20(a) of the 1934 Act. Section 10(b) prohibits actions "involving manipulation or deception ... that are intended to mislead investors by artificially affecting market activity." *Field v. Trump*, 850 F.2d 938, 946–47 (2d Cir.1988).

■ Ashanti moves to dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6). In order to state a claim under Section 10(b), a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir.2000). A motion to dismiss must be denied "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The duty of a court in ruling on a 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir.1984). In ruling on a 12(b)(6) motion, a court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the pleader's favor. *See Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 699–700 (2d Cir.1994); *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F.Supp.2d 129, 134 (S.D.N.Y.2001).

■ In addition to the facts alleged in the complaint, a court may take judicial notice of public disclosure documents filed with the SEC when considering a Rule 12(b)(6) motion. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re MetLife Demutualization Litig.*, 156 F.Supp.2d 254, 259 n. 1 (E.D.N.Y. 2001).

### (1)

Initially, Ashanti argues that the shareholders have failed to allege any actionable statements. The statements are best divided into those made prior to the bank announcement on September 26, 1999 and those made after the bank announcement.

### a. Pre–Bank Announcement Statements.

The majority of the alleged misstatements occurred prior to the rise in the price of gold following the bank announcement. For the most part, the shareholders claim that these statements were false and misleading in that they characterized the hedge book as a precautionary and protective measure, rather than the risky speculation it actually was. Similarly, the shareholders allege that Ashanti withheld specific, material risks to which the purportedly "protective" hedge book exposed the company.

The first group of these alleged misstatements is found in Ashanti's 1998 20–F. Specifically, Ashanti stated:

> Ashanti's principal business is the mining and processing of gold. Its revenues and cash flows are therefore strongly influenced by the price of gold,

which can fluctuate widely and over which the Company has no control.

Ashanti, in common with many other gold producers, engages in hedging activities to protect its cash flows against the risk of falls in the gold price.

Compl. ¶ 14; 1998 20–F at 1, 58. In addition to falsely characterizing the hedge book as a precautionary measure, the shareholders contend that these statements were false in that Ashanti had actually "converted itself" from a mining business to a financial trading entity, and, accordingly, its principal business was no longer the mining of gold. Compl. ¶ 14.

The remainder of the allegedly false statements in the 1998 20–F concern only the misrepresentation that the hedge book was a protective measure, not speculation:

> To reduce the impact on the Company of fluctuations in the price of gold, the Company engages in hedging transactions.[5]
>
> ▇ This *well controlled, orderly market* provides the foundation for many derivative instruments such as futures, options, warrants and swaps. [2] Substantial producers and purchasers use these markets *to hedge, rather than to speculate*, their respective positions. [3] The process involves forward contracts and *options to hedge* part of the production *against falls* in the gold price. This secures a predictable cash flow which assists in planning and forecasting future revenues, ensuring that financial commitments and other undertakings can be met.
>
> Ashanti enters into derivative financial instrument contracts in order to protect itself. . . . The Company *does not ac-quire derivative financial instruments for speculative purposes.*

Compl. ¶¶ 14–15; 1998 20–F at 27, 25, 60 (emphasis added). According to plaintiffs, these statements paint a picture of a conservatively run gold-producing company.

The second group of statements that the shareholders allege were false are included in Ashanti's July 1999 6–K, filed on July 28, 1999.[6] In the July 1999 6–K, Ashanti stated that it had "increased its level of hedging protection to 11 million ounces. Just under 50% of reserves are now hedged at an average price of US$389 per ounce, protecting the Group against the current difficult gold market." Compl. ¶ 19.[7] Moreover, the July 1999 6–K included a table in which Ashanti claimed it stated the "[f]ull details of the latest hedging position." Compl. ¶ 20. The shareholders claim that these statements were false in the same way that the above statements were, in that they characterized the hedging activity as a "protective" measure against fluctuations in the gold market rather than risky speculation. *Id.* In addition, the shareholders argue that the table was fraudulent by omission in that it did not disclose important information related to the instruments in the hedge book. *Id.*

These misrepresentations by Ashanti were allegedly repeated by Keatley, Ashanti's CFO, on July 28, 1999. In an interview carried by Bloomberg Business News, Keatley stated that:

> It has been the strategic aim of Ashanti to maintain a high level of protection. We are going to up our production profile with the construction of the very large Geita mine in Tanzania, which will

---

**5.** The shareholders incorrectly quoted the 1998 20–F here. The complaint alleged that the form stated: "To reduce the fluctuations in the price of gold, the Company engages in hedging transactions." Compl. ¶ 14.

**6.** This date also marks the beginning of the Class Period.

**7.** It does not appear that the shareholders question the accuracy of the figures in this statement.

go in to production in the second half of the year ... We have been building up our hedge book to maintain the same level of coverage ... Fortunately we were able to do this in the early part of the quarter before the announcement by the Bank of England of their [sic] gold auctions ... Hedging gives us the assurance that our cash flow will be sufficient for our new projects and to service our debt.

Compl. ¶ 23.[8]

In all cases, the fundamental premise upon which the shareholders base their claims is that the "hedge" book was risky speculation, and, consequently, the characterization of it as a protective hedging measure was false. Similarly, the shareholders claim that Ashanti concealed the risky nature of the investments in the hedge book from the shareholders. By mischaracterizing and failing to disclose the true nature of the investments in the hedge book, the shareholders argue that Ashanti artificially increased its stock price.

Ashanti, in turn, argues that the hedge characterization statements are not actionable for several reasons. These are addressed in turn.

### 1. Characterization of Futures Activity

Ashanti first argues that the difference between actions that are "hedging" versus actions that constitute "speculation" is amorphous at best, and the use of the term "hedging" as opposed to "speculation" cannot possibly give rise to a securities fraud claim. In other words, Ashanti claims that its characterization of its futures activity cannot result in a viable claim. Specifically, Ashanti argues that the shareholders have failed to satisfy the heightened pleading requirements for securities fraud

claims under Rule 9(b) of the FRCP and § 78u–4(b) of the PSLRA that require plaintiffs to plead with particularity the reasons why the statements were fraudulent.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Similarly, § 78u–4(b)(1) requires that in any securities fraud claim in which the plaintiff alleges that the defendant made an untrue statement of material fact or omitted a material fact, "the complaint shall specify each statement alleged to have been misleading," and "the reason or reasons why the statement is misleading." Accordingly, the complaint must: " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

It is not disputed that the shareholders have specified the allegedly fraudulent statements, but Ashanti argues that given the nebulous nature of the terms "hedge" and "speculate," none of the statements are demonstrably false. In response, the shareholders argue that the difference between the terms is real and clear, and Ashanti's statements that it was hedging and not speculating can be shown to be untrue.

Despite Ashanti's arguments, courts and, presumably, investors and parties in commodities markets, have defined "hedging" and "speculation" and distinguished between them. Indeed, ever since it began considering the futures market, the

---

**8.** The announcement by the Bank of England referenced in this quotation is not the announcement that triggered the rise in gold prices at the heart of this dispute.

Supreme Court has distinguished between players who seek to insure themselves against price changes, and those who seek to profit by taking positions in the market. In *United States v. New York Coffee & Sugar Exch.*, 263 U.S. 611, 44 S.Ct. 225, 68 L.Ed. 475 (1924), the Court described the first group as "those who use [the futures market] to hedge, i.e., to insure themselves against loss by unfavorable changes in price at the time of actual delivery of what they have to sell or buy in their business." *Id.* at 619, 44 S.Ct. at 227. The Court also identified two other "classes" of parties who deal in futures: "legitimate capitalists" who purchase futures "with a view to profit based on the law of supply and demand, and gamblers or irresponsible speculators, who buy or sell as upon the turn of a card." *Id.* The Court added to these definitions and distinctions in the context of the tax consequences of hedging and speculating in *Corn Prods. Ref. Co. v. Comm'r of Internal Revenue*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), where it agreed with administrative decisions "distinguishing speculative transactions in commodity futures from hedging transactions [that] held that hedging transactions were essentially to be regarded as insurance rather than a dealing in capital assets." *Id.* at 52, 76 S.Ct. at 24. In addition, the Court lumped together parties it previously labeled "legitimate capitalist" and "speculator," and distinguished them from manufacturers who hedge to protect themselves against increasing raw materials costs. *Id.* at 50–51, 76 S.Ct. at 23.

More recently, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the Court further sharpened the distinction between the two types of futures trading when it stated:

> Those who are actually interested in selling or buying the commodity are described as "hedgers"; their primary financial interest is in the profit to be earned from the production or processing of the commodity. Those who seek financial gain by taking positions in the futures market generally are called "speculators" or "investors."

*Id.* at 359, 102 S.Ct. at 1829–30. The Court also acknowledged the distinction in two footnotes to this passage. One footnote observed that "when a hedger takes a long or a short position that is greater than its interest in the commodity itself, it is to that extent no longer a hedger, but a speculator." *Id.* at 359 n. 10, 102 S.Ct. at 1830. The other footnote extensively quoted from a House of Representatives report on the Commodities Exchange Act that distinguished between the "two general classifications" of " 'trade' hedging customers and speculators." *Id.* at 359 n. 11, 102 S.Ct. at 1830.

Other courts have established similar distinctions and definitions. For example, in *BP N. Am. Petroleum v. SOLAR ST*, 250 F.3d 307 (5th Cir.2001), the Fifth Circuit discussed in detail "the two distinct classes of players in the futures market." *Id.* at 311 n. 3. Citing *Curran*, the court concluded that "hedging, like insurance, is a method of risk aversion, not risk assumption." *Id.* Similarly, in *Apex Oil Co. v. DiMauro*, 641 F.Supp. 1246, 1250 (S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds*, 822 F.2d 246 (2d Cir. 1987), the court observed that "[i]n theory, there are two types of commodities customers: hedgers and speculators." A hedger has "a parallel interest in the cash market for a commodity" and "uses the futures market as a means of diminishing the risks faced in the cash market." *Id.* On the other hand, a speculator has "no real stake in the cash market and simply hopes to profit by trading in futures contracts as one might by investing in the stock market." *Id.*; *see also Leist v. Simplot*, 638 F.2d 283, 287, 288 (2d Cir.1980), *aff'd sub nom., Curran*, 456 U.S. 353, 102

S.Ct. 1825, 72 L.Ed.2d 182 (noting that "hedging performs an insurance function," although it is different from insurance in the allocation of risk); *Evanston Bank v. Conticommodity Servs., Inc.*, 623 F.Supp. 1014, 1019 nn. 2, 3 (N.D.Ill.1985) (distinguishing hedging and speculating and describing them in two separate footnotes).

Even more importantly, Ashanti itself relied on this distinction in its SEC filings. In its 1998 20–F, Ashanti, presumably seeking to reassure investors that its futures activity was sound, made several statements characterizing that activity as hedging, not speculation. In discussing the gold market, Ashanti stated that "substantive producers" (presumably such as itself) use the market and the derivative instruments bought and sold on it "to hedge, rather than to speculate, their respective positions." 1998 20–F at 25. When disclosing market risks, Ashanti maintained that it "enters into derivative financial instrument contracts in order to protect itself against decreases in the gold price.... The Company does not acquire derivative financial instruments for speculative purposes." *Id.* at 60. Ashanti clearly characterized its futures trading as hedging, stating that "[t]o reduce the impact on the Company of fluctuations in the price of gold, the Company engages in hedging transactions," and that it "engages in hedging activities to protect its cash flows against the risk of falls in the gold price." 1998 20–F at 27, 58. It is clear from these statements that, if made in good faith, Ashanti believed there are important differences between hedging and speculation. It informed potential investors, current stockholders, and regulators that it engaged not in speculation, but in hedging designed to insure itself against falls in the price of gold. See 1998 F–20 at 25. Ashanti therefore is in no position to claim that the difference between the two is too nebulous to be actionable.

Ashanti correctly points out that several courts have observed that "the line between hedging and speculation is sometimes blurred." *Jordon v. New York Mercantile Exch.*, 571 F.Supp. 1530, 1534 (S.D.N.Y.1983), *aff'd in part, rev'd in part sub. nom.*, 735 F.2d 653 (2d Cir.1984). In particular, one Second Circuit opinion noted that "[g]enerally speaking, there are two classes of traders in commodity futures contracts, although, ... the distinctions between them are often blurred," and added, "[i]ndeed, there is no bright-line difference between hedgers and speculators." *Leist*, 638 F.2d at 287, 288; *see also Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F.Supp. 486, 488 n. 8 (S.D.N.Y. 1987) (citing *Leist*).

These cases, however, do not stand for the proposition that the difference between hedging and speculation is so nebulous as to not be actionable. For example, *Leist* first observes that there are generally two types of traders—hedgers and speculators-then notes that speculators sometimes hedge and hedgers sometimes speculate. *See Leist*, 638 F.2d at 287–88. Even if this characterization is accurate, it does not assist Ashanti. Ashanti specifically stated that it was hedging and not speculating. And while Ashanti may have been doing both, the statements still would be actionable if Ashanti's activities were predominantly speculation contrary to its declarations. Nor do the other cases cited by Ashanti go beyond the simple point that there is no bright line between hedging and speculation. *See Jordon*, 571 F.Supp. at 1534; *Minpeco*, 676 F.Supp. at 488 n. 8.

Ashanti also argues the shareholders cannot base a claim on criticisms of the adjectives Ashanti used or failed to use in describing its futures activity. However, the cases cited by Ashanti in this regard are distinguishable, if not inapposite. In these cases, the plaintiffs claimed that de-

fendants did not use sufficiently negative language to describe their activities. *See Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1277 (D.C.Cir.1994) (allegations that defendants should have used "pejorative characterizations" of defendant's competitive position dismissed as "immaterial as a matter of law"); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1069 (5th Cir.1994) (defendants who described a contract as a "particular success" under no duty to use adjectives that plaintiffs believed were more accurate); *Portannese v. Donna Karan Int'l, Inc.,* 1998 WL 637547, at *10 n. 9 (E.D.N.Y. Aug.14, 1998) (securities laws do not require corporate management to describe itself in pejorative terms); *Sheppard v. TCW/DW Term Trust 2000,* 938 F.Supp. 171, 175 (S.D.N.Y.1996) ("Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested."). Unlike these cases, the shareholders do not allege that Ashanti should have described its futures activities in more pejorative language. The shareholders only claim that Ashanti should have used accurate terms. From the discussion above, it is clear that "hedging" and "speculation" describe different futures market strategies. If words such as these which have a long history and are filled with meaning in the market cannot form the basis for a securities fraud claim, then reasonable investors will be unable to rely on many characterizations of activity by companies. Accordingly, Ashanti's use of the terms "hedging" and "speculation" can form the basis of a securities fraud complaint.

However, to meet the heightened pleading requirements the shareholders still must plead the reasons why Ashanti's statements that its actions were hedging and not speculation are fraudulent. This is no easy task. Without access to Ashanti's hedge book, it is more than difficult for the shareholders to prove that Ashanti took such risks in its derivatives trading activity that the statements were fraudulent. Nevertheless, it must be remembered that the shareholders are not required to prove at this stage that Ashanti's statements were fraudulent. They only need to allege the reasons why the statements were improperly misleading.

That being said, even without access to the information in Ashanti's "hedge book," the shareholders have alleged sufficient facts to state a claim under the heightened pleading requirements. The shareholders do not make their allegations as explicitly as they could have, but the claims are clear enough to survive Ashanti's Rule 12(b)(6) motion.

The primary basis for the shareholders' claims is the gravity of the impact of the rise in gold prices following the bank announcement. The complaint clearly alleges that Ashanti valued the hedge book at $290 million in its 1998 July 6–K, and that the *Financial Times* reported its "mark-to-market" value on October 8, 1999 was negative $570 million. Compl. ¶¶ 22, 29(e). If hedging functions as a variety of insurance, as numerous courts have explained, changes in the price of the commodity normally should not lead to losses for parties engaged in it and certainly not to a change in value of $880 million in a company that appears to have a net asset value of only $1.489 billion. *See* 1998 F–20 at F–25. Rather, the increase in the cash price for the commodity producer's reserves should offset any lost profit in futures sales. However, if a participant in the market is speculating, having taken the wrong position on futures sales should result in significant losses with no offsetting gains. Furthermore, even if some losses could be expected from a rise in the price of gold, a turn-around of $880 million in the hedge book's value for a company with $582 million in annual revenue leads to a

fair inference that Ashanti was engaged in more than just insurance-like hedging. Therefore, the allegation that Ashanti suffered large losses on its "hedge book" following the bank announcement alone is a reason why Ashanti's statements that it was engaged in hedging and not speculation were fraudulent.

The complaint also makes the same allegation by quoting an October 8, 1999 article from *The Mining Journal* that stated that "[t]he huge negative value of the hedging book is particularly surprising given Ashanti's hedging position at the end of June." Compl. ¶ 17. The article added the implication of the negative value of the hedge book "is that the reported hedging positions, although indicating the company's exposure to movements in the gold price, did not clearly show its potential exposure to changes in lease rate and volatility." *Id.* The shareholders did not paraphrase these statements into their own allegations, but did comment that the article revealed "the recklessness of Ashanti's 'hedging' positions." *Id.* The obviously implied claim is that the large negative value of the hedge book is a reason why Ashanti's statements were false.

The shareholders also argue that the losses, considered in tandem with the proportion of its gold reserves hedged by Ashanti, is another reason why the statements that it was hedging and not speculating were fraudulent. This allegation also is derived from a quoted newspaper article, in this case an October 6, 1999 *Financial Times* article. The *Financial Times* noted that while the rise in gold prices "increased the long-term value of the company's 23m ounces of reserves," that the hedge book's losses were "unusually high" as a "proportion of total reserves." *Id.* at 34. Again, the shareholders did not paraphrase these statements in

the complaint, but the allegation itself is clear.

Two other facts bolster the shareholders' position. First, all of Ashanti's profits for 1997 and 1998 and two-thirds of its profits in 1996 were a product of its hedging operations.[9] Although this data does not in itself indicate whether Ashanti was hedging or speculating, it contributes to the perception that Ashanti had become more dependent for its profits on the futures market than a producer that was merely hedging would be.

Second, the shareholders also point out that, after the tremendous losses had been revealed, Ashanti's CEO, Sam Jonah, stated in a November 8, 1999 *Financial Times* article he was "prepared to concede that we were reckless. We took a bet on the price of gold. We thought it would go down and we took a position." Compl. ¶ 42. For a producer, betting on the price of gold going down smacks more of speculation than hedging. Moreover, because Ashanti's own CEO characterized the purported hedge book as "reckless," the shareholders maintain, it could not have merely been hedging.

Ashanti counters that the quote attributed to Jonah appeared in a newspaper article over which Ashanti had no control. Because several courts have held that such post hoc statements to the media cannot be the basis of a securities fraud claim, Ashanti argues the same is true here. For example, Ashanti relies on *Strassman v. Fresh Choice, Inc.,* 1995 WL 743728, (N.D.Cal. Dec.7, 1995), where the court refused to rely on a quote in a newspaper, noting that "[i]f the defendants have no control over the third party account, any statement made by them could be taken out of context, incorrectly quoted, or

---

**9.** Again, this data was not pleaded by the shareholders, but the court takes judicial notice of the public disclosure information in the SEC filings.

stripped of important qualifiers." *Id.* at *9 (internal quotations omitted). Similarly, in *Schwartz v. Novo Ind., A/S,* 658 F.Supp. 795 (S.D.N.Y.1987), the court noted that "plaintiff fails to demonstrate how ... it would be fair to draw an inference of fraud from a statement appearing in a news article over which defendant had less than complete control." *Id.* at 799. The cases relied upon by Ashanti deal with holding corporations *liable* for statements contained in news articles. In the present case, plaintiffs merely point to the statement as evidence that *previous* statements made by the defendants were false.[10] Thus, the cases cited by Ashanti are inapposite.

Nevertheless, the post hoc statement by Jonah, standing alone, would have been insufficient to establish that the alleged statements were false when made. The fact that Jonah may have later come to believe that the behavior was reckless does not establish that it was not hedging. However, the statement strengthens the argument that the shareholders have alleged that Ashanti engaged in speculation.

Again, it is important to remember that the shareholders need not *prove* their claims at this point; they only need to *allege* the reasons why the statements were fraudulent. Furthermore, all reasonable inferences must be drawn in the shareholders' favor in deciding Ashanti's 12(b)(6) motion. Accordingly, the shareholders have sufficiently alleged why Ashanti was engaged in speculation and not merely hedging, in contrast to its public statements.

Finally, Ashanti also argues that the shareholders have failed to specify with particularity the facts on which their allegations are based, as required by Rule 9(b) and § 78u–4(b)(1). These heightened pleading requirements often put plaintiffs in a Catch–22 in securities fraud cases. Many plaintiffs do not have access to internal documents of the entities against which they wish to file claims, but those documents are the best way to demonstrate the alleged fraud. In effect, the heightened pleading requirement in many cases prevents plaintiffs from conducting the discovery they need to meet the requirement. *See generally,* Elliott J. Weiss & Janet E. Moser, *Enter Yossarian: How To Resolve The Procedural Catch–22 That The Private Securities Litigation Reform Act Creates,* 76 Wash. L.Q. 457 (1998). Here, the shareholders do not have access at this stage to Ashanti's "hedge book," which would provide them the most assistance in establishing their allegations.

In addressing this dilemma, courts in the Second Circuit have produced varied results when faced with potentially insufficient pleadings. For example, in *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801 (2d Cir.1996), the plaintiffs alleged that the defendant had made a decision to change its pricing strategy several weeks before announcing it, and made false statements in the interim that the strategy had not changed. *Id.* at 812. The only alleged "circumstances to support their allegation" in the complaint was that sales were declining at a faster rate than the defendant had previously announced, and the only way the plaintiffs offered that this fact could be proven was through unidentified confidential internal sales reports of the defendant. *Id.* at 812–13. Presumably, these reports would be uncovered during discovery. The court held that plaintiffs must do more than merely allege the existence of internal reports that contradict the defendant's public statements. *Id.* Rather, plaintiffs must specifically identify the internal reports

---

**10.** Nor does Ashanti claim that Jonah was    incorrectly quoted.

underlying their claims, and identify details such as who prepared the reports, when they were prepared, how firm the data was, and who reviewed them. *Id.* (citing *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 365 (1st Cir. 1994) and *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir.1993)); *see also Ressler v. Liz Claiborne, Inc.*, 75 F.Supp.2d 43, 52–53 (E.D.N.Y.1999) (holding the pleading insufficient because the plaintiffs failed to identify the source of their allegations concerning orders, sales, and consumer demand, nor did they indicate how or when these trends became known to the plaintiffs).

On the other hand, the Second Circuit "do[es] not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir.2001) (holding sufficient pleadings that relied on sales data before and after the relevant period, but not from the relevant period itself, and that adequately identified internal company reports). In some cases, courts appear to read the particularity requirement of Rule 9(b) in conjunction with the general directive of Rule 8 of the FRCP that pleadings should contain a "short and plain" statement of the claim. *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979).

For example, in *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F.Supp.2d 129 (S.D.N.Y.2001), the plaintiffs alleged that the defendants falsely stated to the plaintiffs that the company's cash position was "sound," that they were seeking investments to expand its services business, and that they would use the investment to transition from its old "value added reseller" business to its new services business. *Id.* at 137–38. The district court held that "[w]hile a complaint must give adequate notice of the charges against a defendant, 'it need not marshal all the evidence.'" *Id.* at 137 (quoting *Sierra Rutile Ltd. v. Katz*, 1992 WL 236208, at *6 (S.D.N.Y. Sept.8, 1992)). "Furthermore, courts should not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Id.* (citing *Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1124 (S.D.N.Y.1982) and *Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 247 (S.D.N.Y. 1975)). Accordingly, although the only factual support for the allegation that the defendants' statements were false cited by the court was that the defendants sent out nearly $3 million to pay overdue debt on the old business less than two weeks after the plaintiffs' investment closed, and the source of this information was not identified, the court held that the plaintiffs had adequately stated a claim under the heightened pleading requirements. *Id.* at 137–38; *see also In re Xerox Corp. Sec. Litig.*, 165 F.Supp.2d 208, 221 (D.Conn. 2001) (holding the pleadings sufficient when several statements by the defendants were contradicted only by assertions by the plaintiffs).

Had the shareholders in the present case based their allegations entirely on what they claim is in the "hedge book," *San Leandro* might be most analogous. However, the shareholders do not rely on any internal documents,[11] even if the "hedge book" might provide clearer evidence of the shareholders' allegations. Rather, the relevant facts are derived from Ashanti's own public SEC filings and from media reports. This gives their complaint even more particular factual support than there was in *Liberty Ridge*. Accordingly, the shareholders have met the requirements of Rule 9(b) and § 78u–4(b)(1).

---

11. Thus, there is no need to address the question of whether the documents that comprise the "hedge book" have been sufficiently identified.

Of course, Ashanti disputes the allegations that there is a relevant difference between "hedging" and "speculation" and that their futures activity was speculation. These are issues that can be better resolved with expert evidence and following appropriate discovery. Indeed, at least in the context of taxation, courts have held that the determination of whether futures activity is hedging or speculation is a factual issue, not a legal one. *See Day v. United States*, 734 F.2d 375, 376 (8th Cir. 1984); *Oringderff v. Comm'r of Internal Revenue*, 48 A.F.T.R.2d 81–5908, 1981 WL 11177, at *1 (10th Cir.1981).

### 2. Ashanti's disclosure of risks

Ashanti also argues that it disclosed that the hedge book exposed the company to risk in the event of a rise in the price of gold. In effect, Ashanti contends that the shareholders have failed to state a claim that it made any materially false statements or omitted any material fact because it sufficiently disclosed the risks associated with its hedging operations. The claimed disclosure consists of statements made in the 1998 20–F.[12] Ashanti argues first that it stated that "profitability and ability to pay dividends and undertake capital expenditure is significantly affected by changes in the market price of gold." Pl. Mem. at 12 (quoting 1998 20–F at 26). Second, in its brief, Ashanti quotes the form as cautioning that "revenues and cash flows are … strongly influenced by the price of gold which could fluctuate widely and over which the Company has no control."[13] *Id.* (quoting 1998 20–F at 58).

The problem with both of these warnings is that they were not made in reference to the company's hedging activities.

To the contrary, both "disclosures" were made in the context of the sale of gold mined by Ashanti. The first statement was made under the general heading of "Risk Factors," and was specifically included under the section's "Gold Price Volatility" subheading, not the "Hedging Operations" subheading that followed. 1998 20–F at 26–27. A reasonable investor would naturally interpret the statement as an obvious caution that a drop in the price of gold would result in Ashanti—a gold mining company—receiving a lower price for the gold that it sold, negatively affect its profitability. Accordingly, this cannot be seen as a disclosure of the risk alleged here.

The second "disclosure" was also made in the context of the sale of gold produced by the company, not its hedging operations. Although the passage quoted by Ashanti appears on the surface to disclose some risks of hedging, Ashanti creates a misleading picture by leaving out a critical sentence that puts the quote in context and by omitting a key word. The full text reads, with the portion that Ashanti omitted emphasized:

> *Ashanti's principal business is the mining and processing of gold. Its* revenues and cash flows are *therefore* strongly influenced by the price of gold, which can fluctuate widely and over which the Company has no control.

1998 20–F at 58. Read in its entirety, Ashanti's alleged full "disclosure" of the risks of hedging is in fact another warning that a decline in the price of gold would have a detrimental effect on Ashanti's profits.[14] Therefore, neither of these

---

**12.** These statements were also included in Ashanti's 1996 and 1997 Form 20–F's.

**13.** Notably, although Ashanti makes reference to these statements in its memorandum, it does not rely on them in its discussion.

**14.** In addition, this statement was closely followed by a description of how the hedging activity works to *reduce* these risks.

statements can be read to properly disclose any risks related to the hedge book.

On the other hand, Ashanti did make other cautionary statements related to its hedging activities, but on closer inspection they do not aid Ashanti. In the 1998 20–F, Ashanti stated that it, "in common with other gold producers, engages in hedging activities to protect its cash flows against the risk of falls in the price of gold. . . . As a further measure of protection against downward movement in the gold price, [Ashanti] purchased put options." *Id.* Although this statement did declare that the hedging activity is meant to protect against drops in the price of gold, it made no mention of the fact that a rise in the price of gold could also cause Ashanti to lose money on its "hedging" operations. This description would only serve to reinforce the impression that Ashanti was engaging in traditional hedging.

Ashanti included a slightly clearer caution in the back of the 1998 20–F, in the "Notes to the Financial Statements" in a section titled "Revenue recognition," which reads:

> As described in Accounting Policies, the Company enters into certain hedging transactions. . . . Although the Company's theoretical credit risk is the replacement cost at the then estimated fair value of these instruments, management believes that the risk of incurring losses is remote. Market risk exists due to the fact that the price of gold could rise above the strike price on a position thus creating an exposure in favour of counterparties. The counterparties may call the contract in this instance, subject to any restrictions on margin calls (including margin free limits) which are contained in the contract.

1998 20–F at F–24. The shareholders argue that the statement was no more than a boilerplate risk statement that would be applicable to any hedging activity.

In addition to this statement, Ashanti provided stockholders with financial information related to the hedging activity in the form of a chart. 1998 F–20 at F–20. The chart included information as to the types of instruments in the hedge book, the number of ounces hedged for the following 15 years, and the average price per ounce of the hedged gold for each year. *Id.*

However, neither the chart, nor any explanatory material notes related to the chart, spell out what actual impact a rise or fall in the price of gold would have on the hedge book. Moreover, the shareholders contend that the chart did not include vital information such as the strike prices and margin calls related to the contracts in the hedge book. Because the shareholders claim that the extreme risks taken by Ashanti in this case is something other than mere hedging, they argue that neither of these disclosures adequately informed investors.

In response, Ashanti relies heavily on the Second Circuit's opinion in *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir.1996). In *Olkey*, investors who purchased stock in three investment companies (the "trusts") alleged that the trusts had fraudulently misrepresented the nature of their investment strategies. The trusts were investment companies which specialized in mortgage-backed securities. The specific type of securities purchased by the trusts were related to interest rates in that when interest rates went up, so did the value of the securities. Similar to the present case, the investors in *Olkey* argued that the trusts were making risky investments on the "failed bet that interest rates would rise." *Id.* at 4. When interest rates actually fell, the trusts were not able to pay the dividends they had anticipated. The investors sued, arguing that they were misled to believe that the trusts had balanced portfolios, whereas, in fact, their

investments were made on the bet that interest rates would rise. The district court dismissed the case, finding that the risk of losses resulting from falling interest rates were disclosed by the trusts in their respective prospectuses. The Second Circuit agreed, finding that the various statements in the prospectuses served to disclose the risks faced by the trusts in the event of declining interest rates. Like Ashanti in the present case, the trusts included general cautionary language in their prospectuses, such as "changes in interest rates may have a greater effect on the value of Mortgage–Backed Securities than is the case with more traditional fixed income securities," and "the market value of the Trust's portfolio [is] dependent on market forces not in the control of the Advisor." *Id.* at 6.

Moreover, the trusts specifically warned of the effect of a decline in interest rates by stating that "[a] significant decline in interest rates could lead to a significant decrease in the Trust's net income and dividends while a significant rise in interest rates could lead to only a moderate increase in the Trust's net income and dividends." *Id.* In light of these warnings, the Second Circuit upheld the dismissal of the complaint, finding that the risks had been sufficiently disclosed.

Although the question is close, ultimately *Olkey* is not dispositive in the present case. Initially, the investors in *Olkey* were buying shares in an *investment* company, not a company such as Ashanti which is in the business of gold mining and purportedly relies on investing only to hedge against declines in the price of gold. Accordingly, investors in the trusts in *Olkey* would have to anticipate that changes affecting the investments of that company would have a significant impact on the company's overall financial well-being. Indeed, as noted by the Second Circuit, "[t]he *only* way reasonable investors would then invest in the

Trusts would be if they believed that the probability of rates rising exceeded the probability of interest rates dropping." *Id.*

In contrast, unless otherwise warned, investors in Ashanti—a gold mining company—would have every reason to believe that a rise in the price of gold would only serve to benefit Ashanti, not bring it to its knees. The only warning that Ashanti provided appears in the back of the 1998 20–K, and gives no indication of the *extent* of the potential risks. A reasonable investor in Ashanti would have assumed that as a gold producer, hedging was mainly intended to lock in a profit. Consequently, the warning provided by Ashanti, especially in light of its placement in the Form 20–F, is simply not sufficient to alert a reasonable investor of this potential, material risk.

Ashanti also argues that the chart in the end of the 1998 20–F that details the amount of its profits that were derived from hedging in 1996, 1997, and 1998 disclosed that Ashanti was engaging in such significant derivatives activity that a reasonable investor would have been sufficiently warned. 1998 20–F at F–9. The chart shows that Ashanti derived all of its profits in 1997 and 1998 and two-thirds of its profits in 1996 from its hedging operations. However, this data was to some extent ambiguous, and it could be evidence that Ashanti was successfully hedging as much as engaging in risky speculation. A successful hedger offsets losses in the cash market with profits from future sales. A speculator also profits from future sales-based derivatives, but takes much more risk than a hedger. Therefore, the data is compatible with both conclusions. What is critical here is that Ashanti told investors it was hedging and not speculating. Accordingly, the raw profit data itself do not constitute adequate disclosure of Ashanti's activities.

Finally, Ashanti argues that it disclosed details about its hedging operations and its potential exposure to margin calls and upward gold price movements in an investor conference call on July 28, 1999. During the call, which Keatley conducted along with Ashanti's Chief Operating Officer Trevor Shultz and Managing Director of Exploration Peter Cowley, Keatley explained:

> In terms of the hedging, in our current sensitivity analysis, which, which we update weekly, we anticipate that at, at a gold price of $300 an ounce today—that's, you know, if, without any action on our part to restructure the portfolio, simply—a $40 an ounce increase overnight in the gold price, the, our portfolio would be approximately at break even. They would be more or less at nil value. At a gold price of $325 an ounce, which is $65 an ounce higher than—well, let's say, $70 an ounce higher than today's level, the mark to market would be negative, but it would be within, well within the levels of margin calls which we've negotiated with our counter parties.

Conference Call Tr. at 21.[15]

These statements fail to demonstrate that Ashanti sufficiently disclosed its futures activities. Based on subsequent events, Keatley's statements clearly did not describe the full extent of the risk. When the price of gold did in fact reach $325 an ounce,[16] Ashanti seemingly was not "well within the levels of margin calls" it had negotiated with its counterparties. It is not entirely clear what Ashanti meant by this phrase, but it certainly did not convey the message that if gold reached $325 an ounce it would have such a catastrophic impact that Ashanti would be forced to issue warrants on 15 percent of its stock and sell half of one of its gold mines. Accordingly, Keatley's statements during the conference call do not constitute sufficient disclosure.

In sum, Ashanti sent mixed messages to investors. On one hand, Ashanti specifically and repeatedly told investors that it was active in the futures market to reduce the impact of fluctuations in the price of gold, that it was doing so by hedging, and that it did not speculate. On the other hand, the charts in the back of the 1998 20–F that revealed some details about its futures activity and the statement that some risk existed due to the fact that price of gold could rise gave some indication to

---

**15.** The conference call transcript is Exhibit E of the Henkin Declaration, and is not referred to in the complaint. Normally, in considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must limit itself to facts pleaded in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999). However, both parties rely on statements made during the conference call in various parts of their arguments. These statements are clearly material, so if necessary the plaintiffs will be given leave to amend the complaint to include the conference call transcript. In addition, the PSLRA requires courts to consider all documents relevant to whether a defendant gave proper forward-looking statement safe-harbor warnings. *See Karacand v. Edwards*, 53 F.Supp.2d 1236,

1245–46 (D.Utah 1999); *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1241–42 (N.D.Cal. 1998); 15 U.S.C. § 78u–5(e) ("the court shall consider ... any cautionary statement accompanying the forward-looking statement, which [is] not subject to material dispute, cited by the defendant."). Here, Ashanti uses the conference call transcripts to argue both that it is entitled to the safe harbor for forward-looking statements, and that it disclosed the risks. There appears to be no reason to limit the use of the conference call transcripts to the safe harbor argument.

**16.** According to Ashanti's figures, gold only closed this high once during the relevant period, at $326 an ounce on October 10, 1999, and peaked at $338 an ounce on October 5, 1999. Henkin Decl. Ex. J.

investors that Ashanti was doing more than just hedging. In the end, these disclosures were, however, insufficient because Ashanti held itself out to be a gold mining company, and because the disclosures failed to reveal the extent of the risks taken on by the company.

### 3. Ability to predict potential risk

With respect to the shareholders' claims that Ashanti failed to disclose material risks which the company faced, Ashanti argues that it cannot have been expected to predict the events that led to its financial trouble and, thus, could not have warned investors even if it had wanted to. Ashanti first contends that it could not have been expected to predict that the European banks would take the action they did, and so could not have been expected to warn of the consequences that would follow from that event. Although recognizing that the shareholders do allege that Ashanti tracked the volatility of gold, and should therefore have been aware of the possibility of a sharp rise, Ashanti contends that the shareholders "offer no explanation, however, of how tracking historical volatility enables one to predict that fifteen central banks would take unprecedented coordinated action that would throw the gold market into turmoil, and the facts simply do not support that inference." Defs. Mem. at 28. It argues that the plaintiffs do not and cannot allege that such a prediction was possible, let alone that there is a duty upon publicly held companies to provide such information.

Ashanti's argument, however, mischaracterizes the shareholders' allegations. The proper question is whether Ashanti was under an obligation to anticipate and warn of the effect that a rise in the price of gold such as the one experienced after the bank announcement—whatever its cause—would have on its hedge book. Ashanti is correct that a company need not predict all potential risks to which it could be ex-

posed. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000). Accordingly, complaints alleging securities fraud based on the failure to predict future events have routinely been dismissed. *See, e.g., Caprin v. Simon Transp. Servs.*, 112 F.Supp.2d 1251 (D.Utah 2000) (dismissing complaint because "[p]laintiffs [did] not explain how [the defendant] could have reasonably estimated the amount of loss from accidents that had not yet happened"). Thus, in deciding whether there were material facts reasonably available to Ashanti that should have been disclosed, the first issue is whether a $70 rise in the price of gold was the type of event that could have and should have been anticipated by Ashanti. If so, the second issue is whether Ashanti could have determined the exact nature that such a rise would have on its hedge book. The final question is whether the risks were material and therefore Ashanti was obligated to disclose them.

As to the first question, Ashanti submits several charts showing both the price and volatility of gold in recent years. These charts, Ashanti argues, show that the $70 rise in the price of gold in the present case was an unprecedented, historic event that could not have been predicted. The shareholders respond by first moving to exclude Ashanti's chart on the ground that such evidence cannot be considered on a motion to dismiss. Although Ashanti correctly points out that courts are permitted to take judicial notice of stock prices, *see Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n. 8 (2d Cir.2000), the shareholders argue that Ashanti's charts are interpreted from raw data, they are not the raw data itself. In addition, the shareholders argue that historical volatility is the wrong

factor—the court should look at implied volatility.[17]

Ultimately, the court need not resolve whether it is permitted to consider Ashanti's charts because, even considering the charts, it cannot be said as a matter of law that the $70 price rise was wholly unpredictable. Ashanti's chart only goes back one year from the announcement—hardly a long enough time frame to determine whether a $70 price rise was predictable. The shareholders submit charts which they allege show similar or greater changes in implied volatility and price on thirty occasions over the last 25 years. If this proves to be the case, and the charts appear to support the shareholders' allegation, this is a question that should be resolved by expert testimony. Thus, the shareholders are entitled to prove that the price rise and volatility change in the present case were "reasonably" predictable.

As to the second issue, whether Ashanti could have determined the effect such a change in the value of gold would have on its hedge book, the defendants' own statements reveal that it could and did calculate such hypothetical situations. During the July 28, 1999 conference call, Keatley stated:

At a gold price of $325 an ounce, which is $65 dollars an ounce higher than—well, let's say, $70 an ounce higher than today's level, the mark to market would be negative, but it would be within, well, within the levels of margin calls which we've negotiated with our counter parties. We have some $350 million of credit available from our counterparties in the form of mark to market limits. I guess, I'm sure you're aware, in asking

that question, that that's, that's a severe stress test to subject a portfolio to, and it's in, some ways, an unrealistic one, because—these increases typically do not happen in one day, on that order of magnitude. But I agree with you that this is an appropriate question to ask because it's one we do ourselves every week. We want to make sure we can withstand, you know even a very rapid, very sudden, big increase in the price. . . .

Now, the profile of the mark to market is that these trades accrete value over time in a way that is more than linear. The recent trade will show, will not show any significant mark to market at this time. But with the passage of time, if there's no change in the gold price, those will accrue value, rapidly. So if we did no change to our portfolio, six months from now the sensitivity to the gold price would be, would be much less [than] that what I've indicated today.

Conference Call Tr. at 21–22. In the same interview, Keatley also stated that Ashanti conducted a weekly "sensitivity analysis" which served to calculate what would happen to the hedge book if gold prices rose to certain levels. *Id.* at 21. Moreover, on November 8, 1999, after Ashanti's troubles had come to pass, Keatley stated, in an interview with the *Financial Times*, that the company's exposure could have been "50 per cent" worse "amounting to 70 per cent of its total gold reserves, the company's sole assets." Thus, it appears clear that Ashanti was able to calculate the effect that a sharp rise in the price of gold would have on the hedge book.

17. "Historical" volatility is derived from observed fluctuations in the market value of a financial instrument. "Implied" volatility is derived from the option prices of the instrument. As historical volatility measures past market action, it is not considered to be as an accurate indicator of future volatility. *See* Kimberly D. Krawiec, *More Than Just "New Financial Bingo": A Risk–Based Approach To Understanding Derivatives*, 23 J. Corp. L. 1, 19 (Fall 1997).

■ Whether Ashanti was required to reveal the extent of the potential impact depends on whether such information was material. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir.2000). A fact is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Given the dire effects suffered by Ashanti in the present case, it is difficult to imagine that the potential exposure was not material. At a minimum, a question of fact exists as to the materiality of the undisclosed risk.

Thus, the shareholders have alleged that Ashanti was aware of material risks regarding the impact of a significant rise in the price of gold that should have been disclosed.

### 4. Duty to disclose details of the hedge book

Ashanti also challenges the shareholders' claims that Ashanti should have warned of the potential risks by providing specific information about the hedge book by arguing that Ashanti had no duty to disclose such information. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc.*, 485 U.S. at 239 n. 17, 108 S.Ct. at 987. Ashanti did disclose the overall structure of its hedge book, including the types of contracts, the amount hedged, the average strike prices and the maturity dates of the various contracts. Because there is no regulation requiring more detailed disclosure of hedging activity, Ashanti argues that the lack of certain information does not give rise to a securities fraud claim.

The shareholders do not directly refute this point nor do they argue that any of the information that Ashanti provided was inaccurate. As a result, to the extent that the shareholders are pursuing claims for failing to include certain details of the hedging instruments, those claims are dismissed.

### 5. Safe Harbor

■ As an alternative defense, Ashanti argues that the alleged misstatements are protected by the "safe harbor" provision for forward looking statements in the PSLRA. Under this provision, a statement concerning projections or future plans cannot give rise to a securities fraud claim if either: (1) it is accompanied by meaningful cautionary language, or (2) the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u–5(c)(1). The parties agree that, as a general rule, statements whose truth cannot be ascertained until some time after the time they are made are "forward-looking" statements. *See Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir.1999). Because the statements at issue here were ultimately mere predictions of how the hedge book would perform, Ashanti argues that they are forward-looking statements. Moreover, because of the various cautionary statements discussed above, they are protected because they were accompanied by meaningful cautionary language. *See id.*

■ The shareholders' response to this point is to simply deny that the statements were forward-looking. At issue in the present case are statements calling the investment activity of Ashanti cautionary "hedging" activity. The shareholders argue that this was false because it was not hedging activity at all, it was risky speculation. That is a statement about a then-

existing fact, not a forward-looking statement.

To be sure, some of the alleged statements also contain what appear to be forward-looking statements. For example, the claim that "[i]t has been the strategic aim of Ashanti to maintain a high level of protection" or "Ashanti enters into derivative financial instrument contracts in order to protect itself" may well be seen as forward-looking statements of plans or intent. As a result, these statements may not be actionable in and of themselves, but the shareholders have been quite clear that they are seeking liability for misleading statements concerning what the investment policy of the company *was*. Such statements about the then-existing state of affairs are not protected by the safe harbor provision. *See, e.g., In re Quintel Entm't. Inc. Sec. Lit.,* 72 F.Supp.2d 283, 292–93 (S.D.N.Y.1999) ("statements that the AT & T strategic partnership was contributing to increased net revenues and chargebacks were decreasing were statements of existing facts, not predictions"); *ABF Capital Mgmt. v. Askin Capital Mgmt.,* 957 F.Supp. 1308, 1324 (S.D.N.Y. 1997) (safe harbor inapplicable to statements of present fact). As such, Ashanti's statements are not protected under the safe harbor provision.

**b. Post-announcement statement**

The shareholders also allege that a press release issued after the bank announcement contained actionable misstatements. On September 29, 1999, just three days after the bank announcement, Ashanti issued a press release, stating:

Ashanti's operations have benefitted from the increase in the price of gold since the recent announcement of coordinated action by central banks to regulate official gold sales. Ashanti has restructured 80% of its hedge book to remove sensitivity of the hedge value to further rallies in the gold price. The restructuring was initiated before the recent rally, as part of the Company's contingency planning, and has covered approximately 9 million ounces (out of Ashanti's 11 million ounces book of forwards and put options). It has included converting a substantial component of the forward sales positions into synthetic put options. The Company has already, before the rally, eliminated any exposure to floating lease rates during the rest of 1999 and the first quarter of 2000. Ashanti's hedge book continues to be actively managed and tightly controlled. Management is satisfied that the hedge portfolio is robust in the current gold market and will generate a realized gold price of US$380 per ounce in 1999 and about US$360 per ounce next year.

Compl. ¶ 27. Shortly thereafter, Ashanti's share price climbed to $9.375 per share. The shareholders allege that this press release contained the following false statements:

1. It characterized the Ashanti's trading activity as "contingency planning" rather than speculation.

2. It falsely claimed that Ashanti had eliminated exposure to floating lease rates.

3. It falsely claimed that the hedge book was "actively managed" and "tightly controlled."

Compl. ¶ 28.

■ Ashanti argues that the first allegation does not state a claim because the shareholders have not pleaded any facts to support their assertion that Ashanti's statement was false in that its trading activity was not actually "contingency planning." Ashanti stated in the press release that prior to the rise in the price of gold, it had initiated a restructuring of its hedge book that was designed to remove the sensitivity of the hedge book to further

"rallies" in the price of gold, and that as part of this "contingency planning," it had restructured 80 percent of its hedge book. If Ashanti suffered additional losses subsequent to the September 29, 1999 press release, it may have been false to state that the company had removed the hedge book's sensitivity to further rallies in the price of gold.[18] However, Ashanti is correct that the shareholders have not pleaded any facts to support the allegation that it was false to characterize this attempt, if it actually occurred, as "contingency planning." Trying to reduce expected losses that would result from a potential future adverse occurrence is fairly defined as contingency planning. Accordingly, any claims based on the first allegation are dismissed.

The second statement, that before the rally Ashanti had already eliminated exposure to floating lease rates "during the rest of 1999 and the first quarter of 2000," is actionable. According to the shareholders, these lease rates governed the terms by which Ashanti leased gold fields from others to meet its obligations to mine and deliver gold, and also governed the terms of other types of futures activity in which Ashanti engaged. Compl. ¶ 28(b). The shareholders also clearly allege that floating lease rates contributed to Ashanti's losses. Compl. ¶ 29(f). In deciding whether to dismiss claims based on this statement, it is important to observe that the statement is ambiguous. It could mean that Ashanti either: (1) had eliminated its exposure to floating lease rates from the date of press release, September 29, 1999, through the first quarter of 2000; or (2) had eliminated its exposure from prior to the bank announcement and the rise in the price of gold through the first

quarter of 2000. The first reading would not give rise to any claims. However, if Ashanti claimed that it had eliminated its exposure to floating lease rates from *prior to the rise in the price of gold,* but floating lease rates contributed to the losses Ashanti suffered, the shareholders have pleaded a reason why this statement was false. On a motion to dismiss, all reasonable inferences must be drawn in favor of the plaintiff, and it is reasonable to infer that Ashanti meant that it had eliminated its exposure to floating lease rates from prior to the rise in the price of gold. Therefore, the motion to dismiss regarding this statement is denied.

The third claim is a more difficult question. The accusations that the hedge book was not "actively managed" and "tightly controlled" would seem to be only positive descriptive phrases. A company is not required to describe itself in a negative manner. As observed by the District of Columbia Circuit:

> We agree with the district court that many of plaintiffs' allegations called for pejorative characterizations of disclosed factual matters. Since the use of a particular pejorative adjective will not alter the total mix of information available to the investing public, such statements are immaterial as a matter of law and cannot serve as the basis for a 10b–5 action.

*Kowal v. MCI Comm. Corp.,* 16 F.3d 1271, 1277 (D.C.Cir.1994); *see also Wright v. Int'l Bus. Machs Corp.,* 796 F.Supp. 1120, 1126 (N.D.Ill.1992). The same is true here. Although Ashanti can not have been expected to describe its own hedge book as "not well managed" or "uncontrolled," it need not have made these reassurances, implying that management had matters

18. The highest price of gold during the relevant period prior to September 29, 1999 was $327.30 per ounce on September 28, 1999. The highest price following the press release was $338 on October 5, 1999. Depending on the instruments in the hedge book, Ashanti may have suffered additional losses.

under control. Nevertheless, even assuming that these statements were actionable, plaintiffs have alleged no facts from which it could be inferred that the hedge book was not "actively managed" or "tightly controlled." [19] Consequently, Ashanti's motion to dismiss is granted with respect to this statement.

In sum, the shareholders have met the heightened pleading requirements and have therefore stated a claim that the pre-bank announcements statements characterizing the futures activity as "hedging" rather than "speculation" were fraudulent. The shareholders also have stated a claim that Ashanti failed to disclose the extent of the potential risk in the event of a rise in the price of gold, and that the post-bank announcement statement that it had "eliminated" the risk associated with floating lease rates was fraudulent. However, the shareholders have failed to state a claim that Ashanti's post-bank announcement statements that characterized its futures activity as "contingency planning" and described the hedge book as "actively managed" and "tightly controlled" were fraudulent. Finally, Ashanti had no duty to disclose further details of its hedging activity.

### (2)

### Scienter

■ In addition, Ashanti contends that, even assuming the shareholders have alleged actionable statements, they have failed to properly allege scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This inference may be established by either alleging facts to show that defendants had both motive and opportunity to commit fraud, or alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000). A strong inference may arise "where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information that they had a duty to monitor." *Id.* at 311 (internal citations omitted). The issue of scienter is ultimately a question of fact, and the Second Circuit "has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999). Thus, although general allegations of scienter are insufficient, the Second Circuit has stated that "we are not inclined to create a nearly impossible pleading standard when the 'intent' of a corporation is at issue." *Id.*

■ The shareholders only attempt to show scienter under the second category, conscious misbehavior or recklessness. Accordingly, the shareholders do not allege any motive for fraud. As recently reiterated by the Second Circuit, "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir.2001) (internal citation omitted). If a plaintiff is attempting to prove scienter by showing conscious misbehavior or recklessness, it is not sufficient

---

**19.** Ironically, if true, these allegations would have the perverse effect of indicating that Ashanti was unaware of the falsity of the description of their activity as hedging, not speculation because they were not actively managing or controlling the transactions in the hedge book.

to merely allege that such behavior took place. Recklessness in this context is conduct which is " 'highly unreasonable' representing 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996).

██ The shareholders argue that the facts alleged lead to a strong inference of scienter because Ashanti generally, and Keatley specifically, followed the hedge book closely and knew its contents, and Ashanti showed an inclination to conceal the risks to which Ashanti was exposed as a result of the hedge book. Under *Novak*, a strong inference can be drawn if Ashanti and Keatley "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311. The shareholders base their argument on: (1) Keatley's July 28, 1999 statements on the investor conference call that the hedge book was subjected to hypothetical stress tests, and could withstand a $65 to $70 spike in gold prices— which is exactly what occurred following the bank announcement; (2) Keatley's November 8, 1999 statement in the *Financial Times* that Ashanti's losses could have been 50 percent worse; (3) Jonah's statement in the same article in which he conceded that Ashanti had been reckless and had taken "a bet on the price of gold" going down; (4) the restructuring of the hedge book described in Ashanti's 1999 Form 20–F; (5) the removal of Keatley and most of Ashanti's directors following the financial difficulties revealed in the June 2000 6–K; and (6) the proximity to the bank announcement of the September 29, 1999 press release that Ashanti "benefitted" from the price rise and that the risks associated with floating lease rates had been eliminated.

Some of these facts provide little or no implication of fraudulent intent. The fact that the hedge book was restructured and that Keatley and other officers were removed shows only that Ashanti's board was trying to remedy the financial difficulties it was facing. Nor is there any indication that Keatley or anyone else was removed because of fraudulent conduct.

On the other hand, Keatley's statements regarding the hedge book's ability to withstand a price rise shows that he and Ashanti were aware of the nature of the transactions in the hedge book. This alone does not prove that Ashanti knew that its characterization of its futures activity was not accurate, but since there is a relevant distinction between hedging and speculation, Keatley's statement contributes to the inference that the shareholders' allegations are correct. Moreover, Jonah's stated belief that the company had been reckless and had taken a bet on the price of gold, and that Ashanti's losses could have been 50 percent worse also contribute to the inference that Ashanti knew of the risks. Finally, Ashanti's press announcement three days after the bank announcement that it had "benefitted" from the rise in the price of gold and had "eliminated" the risks from floating lease rates does not prove that Ashanti knew of the losses associated with the hedge book it had suffered, but does allow an inference to be drawn that it knew that its previous statements were inaccurate and that it was trying to conceal the losses. Taken together, these facts pleaded by the shareholders lead to the strong inference that Ashanti knew that its characterizations of its futures activity as hedging and not speculation were false.

## Conclusion

Ashanti's motion to dismiss the shareholders' action for failure to state a claim is denied with respect to the pre-bank announcement statements, except for the shareholders' claim that Ashanti failed to disclose the particulars of the hedge book transactions. In addition, the shareholders are granted leave to amend their complaint to include the transcript of Keatley's July 28, 1999 conference call.

With respect to the September 29, 1999 press release, Ashanti's motion to dismiss is denied as to the statement that it had "eliminated exposure to floating lease rates," but its motion is granted with respect to the other claims related to the September 29, 1999 press release.